## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION, YOUNGSTOWN

| | |
|---|---|
| KAYLA BAKER, CHRISTEN DAVIS, NEELY JACK, WILLIAM JACK, MARIE GORDON-COONTZ, JOHN JURJAVIC, SHELBY VOLLNOGLE and DALQAN HOLDINGS, LLC, individually and on behalf of all others similarly situated, | Case No. 4:23-cv-324 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| NORFOLK SOUTHERN CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY, | |
| Defendants. | |

## INTRODUCTION

Plaintiffs Kayla Baker, Christen Davis, Neely Jack, William Jack, Marie Gordon-Coontz, John Jurjavic, Shelby Vollnogle, and DalQan Holdings, LLC (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (collective, "Norfolk Southern"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## NATURE OF THE ACTION

1. On February 3, 2023, at approximately 8:55 p.m., a Norfolk Southern train carrying hazardous materials derailed in East Palestine, Ohio, igniting an inferno and casting a toxic cloud of poisonous smoke throughout the surrounding area.

2.      Before the derailment, a mechanical defect alarm sounded on the eastbound train. An overheated wheel bearing was failing, and about to lead to the catastrophic trainwreck. In total, thirty-eight railcars left the tracks and an additional twenty railcars were damaged, several of which were carrying dangerous industrial materials.

3.      Damage from the trainwreck caused many of the railcars to breach, discharging more than a million pounds of hazardous chemicals into the local air, soil, and water.

4.      Fire from the wreckage blanketed the area in billowing smoke.



Photo credit: Courtney Kevin Csernik

5.      To make matters worse, heat from the blaze increased pressure inside gas-filled railcars, posing the risk of a deadly explosion. This lead Norfolk Southern to "vent and burn" vinyl chloride, a powerful cancer-causing gas, from five railcars.

6.      Norfolk Southern diverted the vinyl chloride into a hastily excavated trench where it set the chemical ablaze. The fire raged for days, covering local properties in a large plume of thick black smoke and dispersing toxic chemicals for miles. The black

smoke billowed into neighborhoods where Plaintiffs and thousands of people live and work, causing widespread anxiety, panic, and fear about potentially dire health consequences.



Photo credit: Melissa Smith

7.     Prolonged exposure to the hazardous fumes and thick smoke forced Plaintiffs and Class members to sequester themselves inside their homes or to abandon their homes and relocate away from the spread of toxic pollutants.

8.     The toxic plume poisoned livestock and crops, and shut down local businesses as residents either evacuated or stayed locked inside their homes.

9.     The spread of toxic pollutants from the trainwreck likewise caused physical injury to Plaintiffs' properties, and interfered with Plaintiffs' ability to use and enjoy their properties. Plaintiffs and Class members continue to live in the shadow of the toxic trainwreck and toxic burn. Hazardous chemicals continue to seep through soils, contaminating groundwater and surrounding properties. These properties have suffered and continue to suffer a diminution in value by virtue of their proximity to site of the trainwreck, and the stigma associated with being located so near the environmental disaster.

10.    As a result, Plaintiffs and the Class members suffer and will continue to suffer damages, including decreased property values, damage to their real and personal property, lost wages, loss of business income, and loss of business goodwill.

11.    This lawsuit is brought to recover these and other damages by residential property owners and lessees and businesses in close proximity to the trainwreck. Plaintiffs also seek injunctive and equitable relief, including testing and cleaning protocols to abate the toxic discharges, as well as the creation of a fund to finance medical monitoring services to screen, prevent, and treat injuries caused by exposure to Norfolk Southern's toxic discharges.

## THE PARTIES

### A.    Plaintiffs

12.    Plaintiff Kayla Baker is a resident and citizen of the State of Ohio, Columbiana County. Ms. Baker owns residential property in East Palestine, Ohio, and is a member of and seeks to represent the Residential Property Class.

13.     Plaintiff Christen Davis is a resident and citizen of the State of Ohio, Columbiana County. Ms. Davis owns residential property in East Palestine, Ohio, and is a member of and seeks to represent the Residential Property Class.

14.     Plaintiff Neely Jack is a resident and citizen of the State of Ohio, Columbiana County. Ms. Jack leases residential property in East Palestine, Ohio, and is a member of and seeks to represent the Residential Property Class.

15.     Plaintiff William Jack is a resident and citizen of the State of Ohio, Columbiana County. Mr. Jack leases residential property in East Palestine, Ohio, and is a member of and seeks to represent the Residential Property Class.

16.     Plaintiff Marie Gordon-Coontz is a resident and citizen of the State of Ohio, Columbiana County. Ms. Gordon-Coontz owns residential property in East Palestine, Ohio, and is a member of and seeks to represent the Property Class.

17.     Plaintiff John Jurjavic is a resident and citizen of the State of Ohio, Columbiana County. Mr. Jurjavic owns residential property in East Palestine, Ohio, and is a member of and seeks to represent the Residential Property Class.

18.     Plaintiff Shelby Vollnogle is a resident and citizen of the State of Ohio, Columbiana County. Mr. Vollnogle owns residential property in East Palestine, Ohio, and is a member of and seeks to represent the Residential Property Class

19.     Plaintiff DalQan Holdings, LLC is an Ohio limited liability company doing business in East Palestine, Ohio. DalQan Holdings LLC operates a Dairy Queen franchise at 262 S. Market St., East Palestine, Ohio. DalQan Holdings, LLC is a member of and seeks to represent the Business Class.

- 5 -

B.    **Defendants**

20.    Defendant Norfolk Southern Corporation ("NSC") is a corporation formed in Virginia with its headquarters and principal place of business in Atlanta, Georgia.

21.    Defendant Norfolk Southern Railway Company ("NSRC") is a wholly owned subsidiary of NSC. NSRC is a Class I railroad corporation formed in Virginia with its headquarters and principal place of business in Atlanta, Georgia.

22.    Upon information and belief, NSRC has consistently held itself out as conducting business affairs as a conduit for NSC in connection with the ownership and operation of their railway enterprise. Additionally, NSC and NSRC constituted a joint venture in connection with their railway enterprise inasmuch as they agreed to undertake ownership and operation of the enterprise jointly for the purpose of sharing associated profits and losses, and in connection therewith, each contributed their respective skills, property or resources in exercising control or right of control over the facilities.

23.    Defendants are referred to collectively as "Norfolk Southern" throughout this complaint.

24.    Norfolk Southern is one of the Country's largest railway operators. It serves every major container port in the eastern United States and operates approximately 19,300 route miles across 22 states and the District of Columbia, including 2,402 route miles within Pennsylvania alone.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 Class members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

2751491.4

26.     This Court has jurisdiction over Norfolk Southern because Norfolk Southern systematically transacts and conducts business in Ohio, including by transporting hazardous materials by train, from which it derives substantial revenue. Norfolk Southern expected, or should have expected, that its acts would have consequences within Ohio. Norfolk Southern committed the tortious acts complained of herein in this State that caused injuries within this State.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Norfolk Southern has caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

### A.     The trainwreck and massive chemical discharge

28.     On Friday February 3, 2023, at approximately 8:55 p.m., Norfolk Southern Freight Train 32N derailed and crashed in East Palestine, Ohio (Latitude: 40.8360864°N, Longitude: -80.5215884°W) (the "derailment site").

29.     Prior to the wreck, the 141-car train was traveling from Madison, Illinois en route to Conway, Pennsylvania. Twenty of the train's railcars were carrying hazardous industrial materials, including:

     a.     Vinyl chloride: a colorless flammable gas that is manufactured for commercial purposes, primarily to make PVC pipe. Vinyl chloride is classified as a Group A human carcinogen (i.e., the deadliest). Short-term exposure to vinyl chloride causes dizziness, drowsiness, nausea, and headaches. Prolonged exposure can cause organ damage and numerous forms of cancer, including rare liver cancers. There is no known safe level of exposure to vinyl chloride and long-term

health effects may not manifest as a clinical cancer diagnoses for years following initial exposure.

b.　Butyl acrylate: a clear colorless liquid with a sharp characteristic odor. It is used to manufacture paints, sealants, and adhesives. Exposure can cause irritation of the eyes, skin, and upper respiratory system.

c.　Ethylhexyl acrylate: a colorless liquid used in making paints and plastics. When inhaled or absorbed through the skin, it can irritate and burn the skin, eyes, nose, throat, and lungs and cause dizziness, nausea, drowsiness, and headache.

d.　Isobutylene: a colorless, highly flammable gas. Inhalation can cause dizziness, drowsiness, and unconsciousness. Contact with skin or eyes can cause irritation.

e.　Ethylene glycol monobutyl ether: a colorless, toxic, flammable liquid used to make paints and varnish. Its vapors are heavier than air and will spread along the ground and collect in low or confined areas such as sewers and basements. Inhalation may irritate the eyes and nose. Contact with the skin causes headache, nausea, vomiting, and dizziness.

f.　Diethylene glycol: a colorless, odorless, toxic liquid used to make anti-freeze, brake fluids, wallpaper strippers, and as a plasticizer. Ingestion causes abdominal pain, nausea, vomiting, diarrhea, drowsiness, confusion, and unconsciousness.

g.　Hydrogen sulfide: a colorless gas with a pungent odor. It is extremely flammable and highly toxic. Effects of exposure range from headaches and eye irritation to unconsciousness and death.

- 8 -

h.    Hydrogen cyanide: a colorless, poisonous, flammable liquid used in mining and plastics. Exposure interferes with the body's use of oxygen and may cause harm to the brain, heart, blood vessels, and lungs.

i.    Benzene: a colorless or light-yellow liquid used as a solvent and found in industrial emissions and gasoline fumes. Exposure to benzene causes drowsiness, dizziness, irregular heartbeat, confusion, vomiting. Benzene is classified as a Group A human carcinogen (i.e., the deadliest). Exposure to benzene increases the risk of developing acute myeloid leukemia and other blood and bone marrow cancers.

30.    Despite the serious risks posed by the dangerous materials on board, Norfolk Southern failed to take appropriate care when loading the train. Instead, Norfolk Southern back loaded the train with 40% of its weight at the rear. Lighter cars were loaded between the heavy rear tankers and the front engine. This poor railcar placement created accordion or wave-like stress on the train and its axles.

31.    Approximately 40 minutes before it derailed, an overheated wheel bearing sparked and the train caught fire. The train traveled ablaze through Salem, Ohio (approximately 20 miles west of the derailment site) toward East Palestine.

32.    As the train approached East Palestine, an alarm from a wayside defect detector alerted the train crew to the mechanical issue. The train crew applied the emergency brake and the train derailed. Thirty-eight of the train's 141 cars came off the tracks. An additional 20 cars were damaged.

33.    Several of the damaged railcars breached, spilling approximately 688,000 pounds of polyvinyl, 273,394 pounds of ethylhexyl acrylate, 273,394 pounds of ethylene

glycol monobutyl ether, and 206,000 pounds of butyl acrylates, and 500,000 pounds of petroleum, and igniting a massive chemical fire.

34.    On the day of the trainwreck, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m., when brighter colors appeared on radar and the smoke plume had traveled more than 15 miles southeast of East Palestine.

35.    The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow. The smoke plume was blown to the south and east due to a northwest wind that was blowing over the fire, traveling nearly twenty miles east into Pennsylvania.

36.    Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene, discharging a toxic soup of chemicals into the surrounding communities' air, water, and soil.

**B.    Norfolk Southern's million-pound chemical burn pit**

37.    As the pile of burning wreckage continued to blaze, and Norfolk Southern failed to extinguish the fire, concern began to mount that the vinyl chloride railcars would explode. If the railcar exploded, deadly shrapnel could travel up to a mile or more.

38.    Heat from the fire increased pressure inside the vinyl chloride railcars, activating the railcars' emergency relief valves design to vent vinyl chloride to the atmosphere and relieve pressure under emergency conditions. However, at least one of the emergency relief valves failed, spiking pressure and temperatures inside the railcar, and risking imminent explosion. Residents within a one-mile radius of the derailment site were told to immediately evacuate due to the deadly risk of explosion.

2751491.4

39.     With the emergency release valve failing, Norfolk Southern decided to "vent and burn" the vinyl chloride. Norfolk Southern released the growing pressure by piercing holes in the five vinyl chloride railcars, discharging 1,109,400 pounds of cancer-causing vinyl chloride into the environment. For context, the total vinyl chloride emissions across the entire U.S. in 2021 was 428,522 pounds—Norfolk Southern discharged more than twice as much vinyl chloride in connection with this incident.

40.     Norfolk Southern diverted the toxic discharge into a hastily excavated trench where it then burned off the vinyl chloride by setting it ablaze. The chemical burn pit burned for days, covering Plaintiffs, Class members, and their properties in a large plume of thick black smoke and dispersing toxic chemicals for miles.

41.     On Monday, February 6, Ohio Governor Mike DeWine and Pennsylvania Governor Josh Shapiro jointly issued an evacuation order for residents within one-mile-by-two-mile area surrounding the trainwreck. The evacuation order advised that "law enforcement in both states are currently working to ensure that all individuals have left the vicinity" before Norfolk Southern's vent and burn. Evacuated residents were not permitted to return to home until February 8.

42.     Residents of surrounding communities outside of the evacuation zone were advised to shelter in place during the vinyl chloride vent and burn.

43.     Burning vinyl chloride poses major issues—namely, it creates phosgene, a highly poisonous gas used as a choking agent in World War I. Phosgene gas is banned as a chemical warfare agent under the Geneva Convention.

44.     Burning vinyl chloride also releases hydrogen chloride, an extremely unstable compound that bonds with water in the atmosphere to form hydrochloric acid.

2751491.4

Norfolk Southern's vent and burn discharged hundreds of thousands of pounds of hydrogen chloride into the air, risking the downpour of a highly corrosive acid rain.

45.     Compounding the hazard, an inversion layer at around 3,000 feet trapped smoke from the vent and burn in the atmosphere. As a result, the toxic gases began to spread out horizontally in a thick cloud. As residents sheltered in place, the winds shifted, blowing the noxious plume of poison up to thirty miles north of the trainwreck.[1]

46.     The following photo of the smoke from the vent and burn was taken on February 6, 2023 from approximately eight miles away. It shows the inversion layer trapping the toxic smoke.



Photo credit: John Jurjavic

---

[1] *See,* Stan Boney interview with Mahoning County Commissioner Anthony Traficanti, WKBN-27 News (Feb. 6, 2023) ("The winds have shifted and they're blowing the plume more toward our area, Springfield Township, Poland, and Boardman... This thing is not going away yet and it's very toxic") (available at https://www.wkbn.com/news/local-news/east-palestine-train-derailment/shelter-in-place-officials-advising-valley-residents-stay-indoors/) (last accessed Feb. 15, 2023); *see also* Paul Wetzl, *Wind direction through today for East Palestine, Ohio*, WKBN-27 (Feb. 6, 2023) (reporting southwest wind for February 6) (available at https://www.wkbn.com/news/local-news/east-palestine-train-derailment/wind-direction-through-tonight-for-east-palestine-ohio/) (last accessed Feb. 15, 2023).

2751491.4

C.    **Norfolk Southern's failure to contain the toxic spill.**

47.    Despite the immediate dangers posed by the highly toxic chemicals spewing from the wreckage, Norfolk Southern failed to immediately report the trainwreck as required by federal law.[2] Failure to timely report subjects Norfolk Southern to criminal penalty.[3] Norfolk Southern did not report the trainwreck to federal authorities until approximately 10:53 p.m., nearly two hours after the wreck.

48.    As federal, state, and local emergency response teams arrived, Norfolk Southern continued to leave authorities in the dark. Norfolk Southern isolated itself from response teams and conducted its own operational and tactical planning, without key input from federal, state, and local agencies. Confusion abounded as authorities were forced to react to Norfolk Southern's unilateral decisions.

49.    Adding to the confusion, Norfolk Southern failed to provide first responders with key information about the chemicals onboard the wrecked train. This failure left first responders unable to determine how to safely extinguish the fire while it grew out of control.

50.    Norfolk Southern further failed to notify state and local response agencies initially of its intention to vent and burn all five vinyl chloride-containing railcars, rather than just a single railcar as Norfolk Southern identified originally. Moreover, to justify the vent and burn, Norfolk Southern provided authorities with inaccurate information and conflicting modeling about the impact of the proposed vent and burn. Norfolk Southern likewise failed to provide authorities with accurate information about the number of railcars that contained dangerous chemicals. Without accurate information, authorities

---

[2] *See* 49 C.F.R. § 225.9(a)(2)(iv).
[3] *See* 49 C.F.R. § 225.29.

2751491.4

could not make fully informed decisions or take appropriate protective action to prevent or mitigate the devastating consequences of burning more than 1,000,000 pounds of vinyl chloride.

51.     Motivated by a desire to re-open the rail line as quickly as possible, Norfolk Southern failed to explore or articulate alternative courses of action to its proposed vent-and-burn plan. This limited the ability of federal, state, and local authorities to respond and take action to prevent such drastic measures. If they had not been left in the dark, emergency response leaders and responsible governmental authorities could have explored alternative courses of action, including some that may have kept the rail line closed longer but could have resulted in a safer overall approach.

52.     The vent-and-burn strategy allowed Norfolk Railway to reopen on February 8, 2023, a mere five days after the catastrophic trainwreck. But while the railway got up and running, Norfolk Southern stalled cleanup efforts. In order to reconstruct the rail line, Norfolk Southern simply covered and filled contaminated soil, including portions of the burn pit used for the vinyl chloride vent and burn. Norfolk Southern has also failed to otherwise complete removing contaminated soil from the site of the trainwreck.

53.     Acting swiftly to remove all soil that has come into contact with hazardous chemicals is key to cleaning up spill sites and critical to prevent hazardous materials from contaminating surface and groundwater. By failing to act quickly to contain the spill, Norfolk Southern exposed Plaintiffs and the Class members to far greater harm.

**D.     The catastrophic consequences of Norfolk Southern's failure to take proper precautionary and remedial action**

54.     The disastrous impact of the trainwreck is rapidly coming into view. Plaintiffs and Class members continue to suffer from exposure to gases, chemicals,

- 14 -
2751491.4

pollutants, and contaminants from Norfolk Southern's trainwreck and fires. These chemicals are associated with short-term acute health symptoms, longer-term health risks, and potentially hazardous chemical reactions.

55.    Fumes, sediment, and a rise in particulate pollution from the toxic spill and fires have been reported throughout a 30-mile area surrounding the site of the trainwreck.

56.    For example, the EPA particulate pollution monitor in Youngstown, Ohio, more than 23 miles from the derailment site, registered at more than triple the normal amount of ambient particulate matter on February 6, 2023. As the days went on, these troubling numbers continued to rise. On February 9, the particulate levels in Youngstown, Ohio were fully five times higher than they were prior to February 6.

57.    The toxic discharge also contaminated the local groundwater. The EPA detected hazardous materials released from the train in samples from local streams and rivers, including the Ohio River, which provides drinking for more than five million people. The hazardous materials were likewise observed entering storm drains. Oily product was found leaking from the wreckage and pooling in the nearby soil.

58.    Authorities are advising local residents to drink only bottled water, especially if their water is from a private source, such as a well.

59.    Ohio's Department of Natural Resources preliminarily estimates that 3,500 fish across 12 species were killed by the derailment and spillage. Pets and livestock have reportedly been sickened by the toxic fumes and contaminated water.

60.    Many of the hazardous materials discharged from the train are resistant to degradation in the environment, meaning contaminated soil will continue to leech pollutants, both up into the air and down into the surrounding groundwater, and cleanup and monitoring of the area could take years.

61.     Vinyl chloride is especially persistent in the environment. If vinyl chloride contaminates a water supply, it can enter household air when water is used for showering, cooking, or laundry.

62.     Even as these hazardous gases evaporate, their dangers persist. Every time it rains, a flood of new contaminants will enter the local ecosystem. Just one pound of vinyl chloride released into the atmosphere can contaminate five acres of land with hazardous concentration levels. Norfolk Southern discharged over **1,000,000 pounds** of vinyl chloride, meaning the potential geographic reach of this toxic discharge extends for hundreds, if not thousands, of miles.

**E.     Norfolk Southern's history of safety violations and putting profits over people**

63.     As Ohio and Pennsylvania residents face the devastating impacts of the trainwreck, Norfolk Southern collects record profits. According to its 2022 proxy statement, between 2019 and 2021, Norfolk Southern's board approved cumulative shareholder distributions of nearly $10 billion.[4] And in 2021, Norfolk Southern "grew revenue 14% over 2020 results, resulting in record income from railway operations of $4.45 billion."[5]

64.     Norfolk Southern has achieved these record profits by cutting corners and sacrificing safety. In its 2021 Annual Report, Norfolk Southern boasted about cramming

---

[4] See Norfolk Southern, Notice of the Annual Meeting of Shareholders and Proxy Statement (2022) (available at http://www.nscorp.com/content/nscorp/en/investor-relations/financial-reports/proxy-statements/2022-proxy-statement/_jcr_content/mainpar/download/file.res/nsc_proxy_2022.pdf) (last accessed Feb. 16, 2023).

[5] See Norfolk Southern, Annual Report (2021) (available at http://www.nscorp.com/content/dam/nscorp/get-to-know-ns/investor-relations/annual-reports/annual-report-2021.pdf) (last accessed Feb. 16, 2023)

2751491.4

railcars on its tracks in order to grow shareholder returns.[6] Indeed, Norfolk Southern's failure to take safety seriously is borne out by its poor track record.

65.     Norfolk Southern is no stranger to train derailments. According to the Federal Railroad Administration, Norfolk Southern is responsible for more recent train derailments in Ohio and Pennsylvania than any other railroad company. From 2019 through 2022, for example, Norfolk Southern trains derailed 67 times in Ohio. During that same time frame, 74 Norfolk Southern trains derailed in Pennsylvania (89.2% of all derailments in Pennsylvania).

66.     Nor is this the first Norfolk Southern derailment to cause an environmental disaster. On January 6, 2005, a Norfolk Southern train derailed in Graniteville, South Carolina, discharging chlorine and diesel fuel into nearby waterways. In addition, a toxic cloud covered the city, causing mass evacuations. Local wildlife was killed, along with the contaminated local crops and vegetation. Tragically, the Graniteville derailment caused thousands of injuries and nine deaths.

67.     Despite its dubious safety record, Norfolk Southern's shipments of hazardous materials has steadily increased since 2015.[7] All the while, Norfolk Southern has resisted basic safety regulations aimed at protecting lives and the environment. Instead, Norfolk Southern has argued against simple measures like adopting modern braking systems, using stronger tank cars for explosive materials, and providing information on what hazardous material are on board its trains, claiming such measures would be cost prohibitive.

---

[6] *Id.*

[7] See SEC correspondence (available at https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2017/friendsfiduciary011717-14a8.pdf) (last accessed Feb. 15, 2023).

68.     Norfolk Southern has even ignored calls from within to bolster its safety efforts. In 2017, Norfolk Southern blocked a shareholder initiative requesting its board of directors "issue a report describing current company efforts to assess, review, and mitigate risks of hazardous material transportation[.]"[8] Norfolk Southern dismissed the initiative as an attempt to "'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment."[9]

69.     Had Norfolk Southern heeded its shareholders' warning and taken efforts to improve the company's safety measures, this disaster could have been avoided.

## PLAINTIFFS' FACTS

### F.      Residential Property Class Representatives

70.     Plaintiff Kayla Baker owns a home in East Palestine, Ohio, where she resides with her husband and three small children. As a result of the chemical spill and toxic plume invading their property, she and her family lost the use and enjoyment of their property. Ms. Baker and her family live within the evacuation zone and were ordered to evacuate as a huge cloud of smoke invaded their home. Ms. Baker and her children were displaced from their home for ten days, from February 3 until February 13. Since returning, she has noticed a chemical smell emanating from her tap water, which comes from the city water supply. She hired a professional cleaning company to rid her home of toxic residue from the trainwreck. Her property has suffered a stigma and diminution in value from Norfolk Southern's toxic discharge. Ms. Baker is a member of and seeks to represent the Residential Property Class.

---

[8] *Id.*

[9] *Id.*

71.     Plaintiff Christen Davis is a resident of East Palestine, Ohio and owns a home there. As a result of the chemical spill and toxic plume invading her property, she lost the use and enjoyment of her property. She lives approximately one mile from the train derailment and evacuated to escape Norfolk Southern's toxic discharge. She fled her home as the thick black smoke cloud approached her property. She's experienced persistent congestion and malaise, as well as a lingering headache since being exposed to Norfolk Southern's toxic discharge. Her property has suffered a stigma and diminution in value from Norfolk Southern's toxic discharge. Ms. Davis is a member of and seeks to represent the Residential Property Class.

72.     Plaintiffs Neely and William Jack are residents of East Palestine, Ohio and lease a home there. As a result of the chemical spill and toxic plume invading their residence, they lost the use and enjoyment of their home. Neely and her husband William live within the evacuation zone, less than one mile from the train derailment. The pair fled on Sunday February, 5, as the toxic gas and smoke invaded their home. Forced out of their home, they stayed at a Holiday Inn until returning on Wednesday, February 8. The McDonald's at which Neely works closed for a week, leaving Neely without pay. Since returning, the Jacks have noticed a foul sulfur-like stench emanating from their tap water, which is supplied through the public water system. Gas and smoke from the trainwreck has left the Jacks' home with a pungent stench that continues to linger. The Jacks are fearful of the potential health consequences of living so close to the toxic discharge, especially as the noxious smells persist. The Jacks are members of and seek to represent the Residential Property Class.

73.     Plaintiff Marie Gordon-Coontz is a resident of East Palestine, Ohio and owns a home there. Ms. Gordon-Coontz works as a network security representative for a

bank.  She lives in East Palestine with her young daughter as well as several pets. As a result of the chemical spill and toxic plume invading her property, she lost the use and enjoyment of her property. She and daughter live within two miles of the train derailment and were subject to the shelter-in-place order. As she and her daughter sheltered, she witnessed a black mushroom cloud of smoke and toxic plume cover her property. Her property has suffered a stigma and diminution in value from Norfolk Southern's toxic discharge. Ms. Gordon-Coontz is a member of and seeks to represent the Residential Property Class.

74.   Plaintiff John Jurjavic is a resident of East Palestine, Ohio, and owns a home there. As a result of the chemical spill and toxic plume invading his property, he lost the use and enjoyment of his property. Mr. Jurjavic lives just over 2 miles from the train derailment, and evacuated to escape the plume of toxic smoke and gas it invaded his property. He observed chemical residue in nearby steams. His property has suffered a stigma and diminution in value from Norfolk Southern's toxic discharge. Mr. Jurjavic is a member of and seeks to represent the Residential Property Class.

75.   Plaintiff Shelby Vollnogle is a resident of East Palestine, Ohio, and owns a home within 200 yards of the trainwreck. As a result of the chemical spill and toxic plume invading his property, he lost the use and enjoyment of his property. Mr. Vollnogle was ordered to evacuate and was displaced from his home from February 5 until February 10. His property has suffered a stigma and diminution in value from Norfolk Southern's toxic discharge. He was working with a realtor on listing and selling his home before the trainwreck. Stigma from the wreck leaves him with no market for his home. Mr. Vollnogle is a member of and seeks to represent the Residential Property Class.

76.     As a direct and proximate result of Norfolk Southern's acts and omissions that led to the trainwreck and its resulting toxic discharge, Plaintiffs have suffered damages, including physical injury to property, loss of use and enjoyment of property, diminution in property values, and restrictions of their freedom of movement due to evacuation and shelter-in-place orders.

**G.     Business Class Representative**

77.     Plaintiff DalQan Holdings, LLC ("DalQan") operates a Dairy Queen within the evacuation zone at 262 S. Market St., East Palestine, Ohio. Because of Norfolk Southern's toxic discharges, gas, smoke, and dust from the trainwreck invaded the Dairy Queen, leaving a film of dust on surfaces outside and within the Dairy Queen, requiring substantial efforts to clean. DalQan was forced to close its Dairy Queen on Saturday, February 4—the day after the trainwreck—while smoke and gas covered the property. DalQan attempted to operate on Sunday, February 5, but was forced to close early. DalQan then had to close the Dairy Queen for three more days on February 6–8 due to the evacuation order. Since reopening on February 9, some employees have refused to return to work out of concern over the air quality onsite. Moreover, the Dairy Queen relies on regular customers and foot-traffic to avoid economic losses associated with discarding unpurchased, expired food items. Because of Norfolk Southern's toxic discharges, the Dairy Queen has experienced a dramatic reduction in customers and foot traffic.

78.     Norfolk Southern's actions, inactions, and/or omissions has caused present injury to DalQan, including physical injury to property and un-recouped business expenses, as well as loss of revenue, income, and profits. Plaintiff DalQan is a member of and seeks to represent the Business Class.

## CLASS ALLEGATIONS

79.     Plaintiffs bring claims under Federal Rule of Civil Procedure 23 on behalf of

classes of similarly situated persons. Plaintiffs initially propose two classes, as defined

below:

> **All individuals who resided in, leased, or owned property any part of which is within a 30-mile radius of the derailment site as of February 3, 2023 ("Residential Property Class").**

> **All individuals and entities who owned and operated a business, commercial property, or farmland within a 30-mile radius of the derailment site as of February 3, 2023 ("Business Class")**



*Fig. 1: The Class Zone is represented by a radius of 30 miles emanating from the derailment, fire, and explosion site.*

80.     Excluded from the Classes are: (1) Defendants and any of their affiliates,

parents or subsidiaries; all employees of Defendants; all persons who make a timely

election to be excluded from the Class; government entities; and the judges assigned to

2751491.4

this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 trainwreck and resulting toxic spill, arise out of subrogation (equitable, contractual, or otherwise).

81. Also excluded from the Classes are any claims of physical manifestation of personal or bodily injury.

82. Plaintiffs reserve the right to propose additional or more refined classes of Plaintiffs in connection with their Motion for Class Certification, and as determined by the Court in its discretion.

83. The Classes plainly satisfy the requirements of Rule 23(a) and Rule 23(b) and there are no interclass conflicts.

84. **Ascertainability**: The number and identity of Class members can be easily ascertained. The proposed classes include residents and businesses within distinct geographic boundary, whose persons and property were wrongfully exposed to vinyl chloride and other toxic chemicals. The Class members may be identified by property records and other public records and may be notified of this action through standard methods.

85. **Numerosity**: The members of the Classes are so numerous that joinder of all members is impractical. The proposed Classes likely contain thousands of members.

86. **Commonality**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Classes.

87. For Plaintiffs and the Classes, the common legal and factual questions include, but are not limited to, the following:

    a.    Whether Norfolk Southern's acts and omissions caused the trainwreck;

b.     Whether Norfolk Southern's acts and omissions caused the dispersal of toxic chemicals and contaminated the surrounding air, water, and soil;

c.     Whether Norfolk Southern's acts and omissions caused the evacuation orders;

d.     Whether Norfolk Southern's act and omissions caused the shelter-in-place advisories;

e.     Whether Norfolk Southern's acts and omissions caused property values to diminish in the affected geographic region;

f.     Whether property damages have occurred to homes, business, and farmland in the affected geographic region;

g.     Whether Norfolk Southern's acts and omissions caused Class members to incur expenses for displacement from their homes, jobs, and businesses;

h.     Whether Norfolk Southern's acts and omissions have created a public or private nuisance;

i.     Whether Norfolk Southern's acts and omissions caused a trespass to residential, commercial, or agricultural property;

j.     Whether Norfolk Southern's acts and omissions caused inconvenience to the Class members by disrupting their daily lives;

k.     Whether Norfolk Southern breached its duties in transporting ultrahazardous materials;

l.     Whether Plaintiffs and the Class are entitled to medical monitoring to facilitate early detection of diseases known to be associated with the toxic

- 24 -

chemicals released into the air, water, and soil as a result of Norfolk Southern's acts and omissions;

m.      Whether Norfolk Southern is liable to Plaintiffs and the Class members for punitive damages resulting from the trainwreck and its aftermath; and

n.      Whether Plaintiffs and the Class members are entitled to relief.

88.      **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all the members of the Classes have been injured by Norfolk Southern's same wrongful acts and omissions. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes, and are based on the same legal theories.

89.      **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Classes.

90.      **Rule 23(b)(2):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Norfolk Southern has acted and failed to act on grounds generally applicable to Plaintiffs and the Classes and that require court imposition of uniform relief to ensure compatible standards of conduct toward the Classes, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Rules 23(b)(2).

91.      **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only

individual members of the Classes, and a class action is superior to individual litigation. The amount of damages available to most individual plaintiffs is insufficient to make litigation addressing Norfolk Southern's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer case management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

## Claim 1: Negligence

92.     Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

93.     Under federal and state law, Norfolk Southern had a duty to use reasonable care to conduct its operations in transporting hazardous and toxic chemicals, including, but not limited to, the following duties:

a.     Operating, maintaining, inspecting, and/or repairing the railway and railcars to ensure their safety and proper operation;

b.     Ensuring alarms and other systems for monitoring malfunctions of the railway to prevent derailments;

c.     Ensuring proper safety procedures in the event of a mechanical malfunction of equipment;

d.     Ensuring proper mechanism(s) for stopping malfunctioning railcars without derailment;

2751491.4

e.     Avoiding overloading the train with excessive railcars or materials;

f.     Loading the railcars consistent with accepted practice;

g.     Loading the railcars to avoid placements of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.     Having an adequate number of staff on board for purposes of planning, coordinating, overseeing, and monitoring transport;

i.     Hiring, training, managing, and supervising agents and employees (including the train engineer and dispatcher operating the Freight Train at the time of the trainwreck);

j.     Properly determining the qualifications and capabilities of agents and employees (including the train engineer and dispatcher operating the Freight Train at the time of the trainwreck);

k.     Properly determining the adequacy and skill of agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck);

l.     Ensuring that agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck) were properly and adequately instructed and trained;

m.     Properly instructing and adequately training agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck) concerning safety and emergency procedures in the event of a possible derailment;

n.     Routing railcars to avoid populated areas in order to minimize the risk of accidental exposure to hazardous materials;

o.      Adequately warning those in danger of exposure to hazardous materials;

p.      Instituting proper procedures and training for response to mechanical malfunction of a railcar;

q.      Instituting proper procedures and alarms to identify and address fire on a railcar;

r.      Instituting proper procedures and training to deploy the emergency brake in the event of a mechanical malfunction;

s.      Instituting proper procedures and training to deploy the emergency brake in the event of a fire on a railcar;

t.      Instituting proper procedures and training for response to derailment;

u.      Instituting proper procedures for timely notifying governmental authorities of a derailment;

v.      Instituting proper procedures in the event of a derailment to avoid exposing the environment to hazardous materials;

w.      Timely implementing an emergency-response plan in the event of a derailment;

x.      Transporting and handling dangerous chemicals so as not to cause harm to Plaintiffs, as Plaintiffs were foreseeable victims located within the zone of danger of Norfolk Southern's conduct;

y.      Properly disposing of or otherwise eliminating the hazardous materials from the derailment site, including avoiding the use of techniques that

further exposed Plaintiffs and the Class members to phosgene and hydrogen chloride during a vent and burn of vinyl chloride;

z.      Timely evacuating an appropriate geographic region to avoid exposing individuals to toxic substances and causing injury;

aa.     Accurately advising of the risk of catastrophic injury and illness from exposure to hazardous chemicals to persons at risk of exposure (both inside and outside the actual evacuation zone);

bb.     Containing the spread of hazardous chemicals and by-products—including vinyl chloride, butyl acetate, benzene, phosgene, hydrogen chloride, and other combustible liquids—into the air, water, and soil; and

cc.     Investigating the causes of its disproportionate number of derailments relative to its competitors and implementing appropriate remedial measures to avoid future derailments.

94.     Norfolk Southern breached its duties to Plaintiffs and Class members in at least the following ways:

a.      Failing to operate, maintain, inspect, and/or repair the railway and railcars to ensure their safety and proper operation;

b.      Failing to ensure alarms and other systems for monitoring malfunctions of the railway to prevent derailments;

c.      Failing to ensure proper safety procedures in the event of a mechanical malfunction of equipment;

d.      Failing to ensure proper mechanism for stopping malfunctioning railcars without derailment;

- 29 -

e.      Failing to avoid overloading the train with excessive railcars or materials;

f.      Failing to load the railcars consistent with accepted practice;

g.      Failing to load the railcars to avoid placements of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h.      Failing to have an adequate number of staff on board for purposes of planning, coordinating, overseeing, and monitoring transport;

i.      Failing to hire, train, manage, and supervise agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck);

j.      Failing to properly determine the qualifications and capabilities of agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck);

k.      Failing to properly determine the adequacy and skill of agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck);

l.      Failing to ensure that agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck) were properly and adequately instructed and trained;

m.      Failing to properly instruct and adequately train agents and employees (including the train engineer and dispatcher operating the train at the time of the trainwreck) concerning safety and emergency procedures in the event of a possible derailment;

2751491.4

n.      Failing to route railcars to avoid populated areas in order to minimize the risk of accidental exposure to hazardous materials;

o.      Failing to adequately warn those in danger of exposure to hazardous materials;

p.      Failing to institute proper procedures and training for response to mechanical malfunction of a railcar;

q.      Failing to institute proper procedures and alarms to identify and address fire on a railcar containing hazardous materials;

r.      Failing to institute proper procedures and training to deploy the emergency brake in the event of a mechanical malfunction;

s.      Failing to institute proper procedures and training to deploy the emergency brake in the event of a fire on a railcar containing hazardous materials;

t.      Failing to institute proper procedures and training for response to derailment;

u.      Failing to institute proper procedures for timely notifying governmental authorities of a derailment;

v.      Failing to institute proper procedures in the event of a derailment to avoid exposing the environment to hazardous materials;

w.      Failing to timely implement an emergency-response plan in the event of a derailment;

x.      Failing to transport and handle dangerous chemicals so as not to cause harm to Plaintiffs and the Classes, as Plaintiffs and the Classes were foreseeable victims located within the zone of danger of Norfolk Southern's misconduct;

y. Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including avoiding the use of techniques that further exposed Plaintiffs and the Class members to phosgene and hydrogen chloride during a vent and burn of vinyl chloride;

z. Failing to timely evacuate an appropriate geographic region to avoid exposing individuals to toxic substances and causing injury;

aa. Failing to accurately advise of the risk of catastrophic injury and illness from exposure to hazardous chemicals to persons at risk of exposure (both inside and outside the actual evacuation zone);

bb. Failing to contain the spread of hazardous chemicals and by-products—including vinyl chloride, butyl acetate, benzene, phosgene, hydrogen chloride, and other combustible liquids—into the air, water, and soil;

cc. Failing to investigate the causes of its disproportionate number of derailments relative to its competitors and implement appropriate remedial measures to avoid future derailments;

dd. Failing to reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous substances—including vinyl chloride, butyl acetate, benzene, phosgene, hydrogen chloride, and other combustible liquids; and

ee. Otherwise unreasonably causing injury to Plaintiffs and the Class members in ways further investigation and discovery will reveal.

95. Norfolk Southern owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, which it had previously blocked shareholder efforts to monitor and improve.

96.     Norfolk Southern owed and breached a duty of reasonable care commensurate with the release and burning of hazardous chemicals, including the resultant release of phosgene and hydrogen chloride into the air, water and soils.

97.     Given the significant likelihood of contamination of neighboring areas and exposure to their residents, Norfolk Southern had a duty to investigate the extent to which the "vent and burn" of hazardous material was likely to contaminate the air, water, and soil to levels that would materially increase residents' risk of developing cancer and other latent diseases.

98.     The damages sustained by Plaintiffs and the Class members were caused or exacerbated by the fact that Norfolk Southern failed to take necessary actions to mitigate the dangers associated with its operations.

99.     As a direct and proximate result of Norfolk Southern's release of hazardous materials throughout a 30-mile radius of the derailment site, Plaintiffs' and Class members' properties were, and are, being physically invaded by Norfolk Southern's toxic discharges.

100.    As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and Class members suffered property damages as alleged herein, including physical injury to their property; as corroborated by the presence of odor, visible mists and droplets on properties, and residents' health symptoms, including nausea, headaches, vomiting, dizziness, light-headedness, and nosebleeds; as well as by meteorological and atmospheric analysis of the toxic plume invading residential, commercial, and agricultural properties.

101.    Norfolk Southern's toxic discharges on Plaintiffs' and Class members' properties forced Plaintiffs and many Class members to relocate to avoid the toxic

invasion. The displacement, inconvenience, and relocation of residents were a direct and proximate result of Norfolk Southern's negligence.

102.    As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and Class members suffered and will continue to suffer the loss of the quiet use and enjoyment of their properties as well as enjoyment of public properties in their communities.

103.    As a direct and proximate result of Norfolk Southern's negligence, Plaintiffs and Class members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to repair the damage and restore the property to its condition prior to the trainwreck and toxic discharges, plus the value of their lost use of the property as a result of Norfolk Southern's negligence.

104.    Plaintiffs and the Class members suffer and will continue to suffer decreased property values, damage to their real and personal property, lost wages, loss of business income, and loss of business goodwill.

105.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights so as to warrant imposing punitive damages.

## Claim 2: Strict Liability for Ultrahazardous Activities

106.    All allegations and paragraphs in this complaint are incorporated by reference.

107.    At all times relevant to this action, Norfolk Southern was the owner and operator of Norfolk Southern Freight Train 32N.

- 34 -

2751491.4

108.    At all times relevant to this action, Norfolk Southern had supervision, custody, and control of Norfolk Southern Freight Train 32N.

109.    At all times relevant to this action, Norfolk Southern was under a continuing duty to protect the Plaintiffs and the Class from the hazardous chemicals and materials.

110.    Norfolk Southern engaged in ultrahazardous activities by transporting hazardous chemicals and toxic pollutants.

111.    Norfolk Southern is responsible for the harm to Plaintiffs, their land, and their property resulting from its ultrahazardous activity, regardless of whether it exercised the utmost care to prevent the harm. *See* Restatement (Second) of Torts §§ 519–520.

112.    Plaintiffs and the Class have suffered harm from Norfolk Southern's toxic discharges emanating from Norfolk Southern's trainwreck. The injuries sustained by Plaintiffs and the Class members as a result of the toxic discharge of hazardous chemicals that was the direct and proximate result of Norfolk Southern's activities.

113.    The harm to Plaintiffs and the Class members was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting hazardous and toxic chemicals in close proximity to residential, commercial, and agricultural areas.

114.    Norfolk Southern's operations and resulting toxic discharges were and remain substantial factors in causing the harms suffered by Plaintiffs and the Class members.

115.    Additionally, Norfolk Southern was aware that its failure and/or disregard for having established plans, processes, and/or protocols for preventing and appropriately responding to the toxic discharge of hazardous chemicals would lead to the

2751491.4

probable dangerous consequence of a sustained catastrophic event and harm or injury to the health and safety of Plaintiffs and their community.

116. As a direct and proximate result of Norfolk Southern's ultrahazardous activities, Plaintiffs and the Class members suffer and will continue to suffer decreased property values, damage to their real and personal property, lost wages, loss of business income, and loss of business goodwill.

117. In failing to take protective measures to safeguard against the dangers, Norfolk Southern acted with a willful and/or knowing disregard of the probable dangerous, and/or acted with an awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiffs and the community of residents living near the trainwreck. Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights. Plaintiffs are entitled to punitive and exemplary damages in an amount to be ascertained, which is appropriate to punish or set an example of Norfolk Southern and deter such behavior by it and others in the future.

## Claim 3: Trespass

118. All allegations and paragraphs in this complaint are incorporated by reference.

119. Norfolk Southern knew or should have known that the hazardous chemicals it transported, released, and intentionally ignited were dangerous and harmful to people, animals, and real and personal property. It was substantially certain that the emission, discharge, disposal, distribution, spread, or release of these toxic substances would injure Plaintiffs and their property.

2751491.4

120.    Norfolk Southern intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass in the following manners: i) by discharging through the trainwreck and resulting fires pollutants, particulates, oily residue, and chemicals, such as vinyl chloride, butyl acrylate, ethylhexyl acrylate, isobutylene, ethylene glycol monobutyl ether, diethylene glycol, carbon monoxide, hydrogen sulfide, hydrogen cyanide, and benzene and other unknown chemicals and matter into the air, water, and soils; and ii) by allowing or causing such chemicals to discharge, seep, or migrate underground in such a manner that it was reasonably foreseeable that the toxic material would, in due course, invade Plaintiffs' and Class members' real property and cause physical injury to that property. Collectively, these discharges, seepage, and migration are referred to herein as "Norfolk Southern's Toxic Discharges."

121.    Norfolk Southern's Toxic Discharges invaded the real property of Plaintiffs and the Class, and interfered with their possessory interests of that property.

122.    Norfolk Southern's Toxic Discharges onto the real property of Plaintiffs and the Class members caused physical damage to their property by casting over their property a plume of offensive emissions, pollutants, depositing chemical residue on their homes, yards businesses, and farms, causing damage to their trees and landscaping, and invading their real property with a nauseating smell over a continuous and sustained period of time.

123.    Norfolk Southern's Toxic Discharges caused Norfolk Southern to enter, invade, and intrude on the real properties of Plaintiffs and the Class members without their privilege, permission, consent, authorization, invitation, or justification.

124.    Additionally, Norfolk Southern, through its activities alleged above, authorized, requested, or caused others to dispose of waste in a manner that it knew was

substantially likely to cause hazardous materials to enter and contaminate Plaintiffs' properties. Through its actions in intentionally causing others to spread its waste, Norfolk Southern intentionally, knowingly, and negligently caused hazardous materials to invade Plaintiffs' properties.

125.    Norfolk Southern was aware that its Toxic Discharges were contrary to Plaintiffs' and Class members' rights in their properties.

126.    Norfolk Southern's conduct displayed indifference to and disregard for Plaintiffs' rights to their land.

127.    Norfolk Southern's intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' and the Class members' real and personal property with hazardous materials has interfered with their rights to use and enjoy their property and constitutes trespass and continuing trespass. Norfolk Southern's trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged.

128.    Norfolk Southern's trespass has also interfered with and continues to interfere with Plaintiffs' and the Class members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs and the Class members so choose.

129.    As a direct and proximate result of Defendants' trespass, Plaintiffs and Class members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to repair the damage and restore the property to its pre-trespass condition, the costs of recovering possession of the property, business losses, and the value of their lost use of the property as a result of all trespass and for Norfolk Southern's ongoing trespass

130.     Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights so as to warrant imposing punitive damages.

### Claim 4: Trespass to Chattels

131.     All allegations and paragraphs in this complaint are incorporated by reference.

132.     Plaintiffs and the Class members had a possessory interest in all of their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, professional equipment, recreational equipment, livestock, and pets.

133.     Norfolk Southern's Toxic Discharges impaired the condition, quality, and/or value of Plaintiffs' and the Class members' personal property.

134.     Through the acts and omissions described above, Norfolk Southern deprived Plaintiffs and the Class members of the use of their personal property for a substantial time.

135.     Through the acts and omissions described above, Norfolk Southern caused harm to personal property in which Plaintiffs and the Class members had a legally protected interest.

136.     As a direct and proximate result of Norfolk Southern's misconduct, Plaintiffs and the Class members suffer and will continue to suffer decreased property values, damage to their personal property, lost wages, loss of business income, and loss of business goodwill.

137.     Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members rights so as to warrant imposing punitive damages

2751491.4

## Claim 5: Private Nuisance

138.    All allegations and paragraphs in this complaint are incorporated by reference.

139.    Norfolk Southern's Toxic Discharges have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property.

140.    Norfolk Southern knew or should have known that the hazardous chemicals it was transporting (and their byproducts if ignited) were hazardous to human beings and real property, and that it was substantially certain that improper transportation, handling, and disposal of such materials would injure Plaintiffs and their property.

141.    Norfolk Southern's trainwreck and Toxic Discharges would reasonably annoy and disturb an ordinary person, as shown by, for example, the community outrage in response to Norfolk Southern's Toxic Discharges, and the nationwide interest in the impact of the trainwreck on Plaintiffs and the Class, as well as on the local environment.

142.    The seriousness and gravity of the harm associated with Norfolk Southern's Toxic Discharges outweigh the public benefit of Norfolk Southern's conduct. There is no social utility associated with the release of literally millions of pounds of toxins into a residential, commercial, and agricultural environment.

143.    Plaintiffs and the Class members suffered and continue to suffer a harm and injury to their residential, commercial, and agricultural properties to which they did not consent and which is different from the type of harm suffered by the general public.

144.    Norfolk Southern's contamination of Plaintiffs' property with toxic substances has unreasonably and substantially interfered with Plaintiffs' rights to use and enjoy their property. It has caused Plaintiffs to refrain from using or occupying their property. It has caused Plaintiffs to refrain from using contaminated water for drinking,

cooking, bathing, irrigation, or watering livestock. This has caused significant loss of income, out-of-pocket expense, and inconvenience.

145. Norfolk Southern's actions have also substantially interfered with Plaintiffs' ability to enjoy their property, avail themselves of their property's value as an asset or source of collateral for financing, or to use their property in the manner that they so choose. It has also caused a reduction in the value of their land.

146. Norfolk Southern's actions described above were unreasonable and constitute invasion of Plaintiffs' property rights.

147. Plaintiffs and the Class members, unlike the public generally, have suffered specific injuries as a result of Norfolk Southern's tortious conduct including the contamination of their land and water.

148. Norfolk Southern's improper transportation and handling of toxic chemicals, and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance.

149. Plaintiffs and the Class members suffer and will continue to suffer decreased property values, damage to their real and personal property, lost wages, loss of business income, and loss of business goodwill.

150. Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights so as to warrant imposing punitive damages.

## Claim 6: Public Nuisance

151. All allegations and paragraphs in this complaint are incorporated by reference.

152.    Norfolk Southern's Toxic Discharges have created conditions that are harmful to health and interfere with the comfortable enjoyment of life and property. As a result of Norfolk Southern's actions and inactions, Plaintiffs have suffered a permanent loss of use and enjoyment of their property.

153.    Norfolk Southern knew or should have known that the hazardous chemicals it was transporting (and their byproducts if ignited) were hazardous to human beings and real property. It was substantially certain that improper transportation, handling, and disposal of such materials would injure people in the surrounding communities.

154.    Plaintiffs and the Class members have a common right to enjoy their real property free from dangerous contamination, to breathe clean air, have access to clean running water without dangerous levels of toxic chemicals, and to live their lives without unreasonable exposure to toxic chemicals.

155.    Norfolk Southern, through its negligent, reckless, or intentional acts and omissions described above, substantially and unreasonable infringed upon and transgressed these public rights.

156.    As a direct and proximate result of Norfolk Southern's improper transportation and handling of toxic chemicals, Plaintiffs' and the general public's common right to breathe clean air and have access to clean water without dangerous levels of toxic chemicals was severely diminished, if not entirely eliminated.

157.    As a direct and proximate result of Norfolk Southern's Toxic Discharges, Norfolk Southern invaded and contaminated the areas surrounding Plaintiffs' and the Class members' residences and businesses, thus exposing them to toxic chemicals and carcinogens.

158.    Defendants' Discharges also affect and continue to affect the public at large, causing massive environmental damage to the surrounding area.

159.    Defendants' conduct is a substantial factor in causing Plaintiffs and the Class, to suffer and to continue to suffer harm, injury, and losses, including physical injury to property, loss of use and enjoyment of their property, and diminution in property values, lost wages, loss of business income, and loss of business goodwill.

160.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights so as to warrant imposing punitive damages.

## Claim 7: Statutory Nuisance

161.    All allegations and paragraphs in this complaint are incorporated by reference.

162.    Section 112 of the federal Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and sets a national emission standard. 41 Fed. Reg. 46560.

163.    Under the Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is forbidden to emit air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act. Any violation of the PAPCA constitutes a public nuisance and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement." 35 P.S. § 4013.

164.    Under Ohio Rev. Code § 3704.03, "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection"

165.    Norfolk Southern's trainwreck, fire, intentional ignition of vinyl chloride, and resulting Toxic Discharges emitted dangerous amounts of vinyl chloride and other

- 43 -

hazardous chemicals into the air in and surrounding the properties of Plaintiffs and the Class members.

166.    As a direct and proximate result of Norfolk Southern's acts and omissions described above, Plaintiffs and the Class members have had their bodies and property exposed to hazardous air pollutants in violation of Pennsylvania, Ohio, and federal law.

167.    Plaintiffs' and the Class members' exposure to the toxic chemicals resulting from Norfolk Southern's Toxic Discharges caused Plaintiffs and the Class members to suffer and continue to suffer harm, injury, and losses, including physical injury to property, loss of use and enjoyment of their property, and diminution in property values, lost wages, loss of business income, and loss of business goodwill.

168.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights so as to warrant imposing punitive damages.

## Claim 8: Wanton and Willful Misconduct

169.    All allegations and paragraphs in this complaint are incorporated by reference.

170.    Norfolk Southern had a duty to Plaintiffs and the Class members to refrain from wanton or willful misconduct.

171.    On information and belief, Norfolk Southern was aware that it was transporting substances that were highly toxic, carcinogenic, or otherwise harmful to human beings, animals, and the environment.

172.    On information and belief, Norfolk Southern was aware that transporting, releasing, and igniting substances that were highly toxic, carcinogenic, or otherwise

- 44 -

harmful to human beings, animals, and the environment could result in unreasonably dangerous emission of hazardous materials into the surrounding areas.

173.   On information and belief, Norfolk Southern knew or should have known that at least one railcar was malfunctioning and/or on fire for at least 20 miles before the trainwreck.

174.   Despite its knowledge, and contrary to federal and standard industry practices and procedures, Norfolk Southern breached its duties as described in Claim 1 above.

175.   Through its actions and omissions described above, Norfolk Southern failed to exercise any care toward Plaintiffs and the Class members, to whom it owed a duty of reasonable care. This failure to exercise any care occurred under circumstances for which the probability of harm was great and the probability of harm was known to Norfolk Southern.

176.   Through its actions and omissions described above, Norfolk Southern intentionally deviated from a clear duty or definite rule of conduct, acted with a deliberate purpose not to discharge a duty necessary to safety, or purposely performed wrongful acts with knowledge and appreciation of the likelihood of resulting injury.

177.   As a direct and proximate result of Norfolk Southern's wanton and willful misconduct, Plaintiffs and the Class members have suffered and continue to suffer harm, injury, and losses, including physical injury to property, loss of use and enjoyment of their property, and diminution in property values, lost wages, loss of business income, and loss of business goodwill.

178.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members' rights so as to warrant imposing punitive damages.

## Claim 9: Inducing Panic through Disorderly Conduct under Ohio Rev. Code §§ 2307.60, 2917.31, and 2917.11

179.    All allegations and paragraphs in this complaint are incorporated by reference.

180.    Ohio Rev. Code § 2917.31(A)(3) provides that "[n]o person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by doing any of the following: . . . [c]ommitting any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm."

181.    Ohio Rev. Code § 2917.11(A)(4) prohibits "[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender."

182.    Ohio Rev. Code § 2917.11(A)(5) prohibits "[c]reating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender."

183.    Through the acts and omissions described above, Norfolk Southern induced panic through disorderly conduct.

184.    Norfolk Southern had no lawful or reasonable purpose in derailing the train.

185.    Norfolk Southern had no lawful or reasonable purpose in releasing and igniting thousands of pounds of toxic chemicals into the environment.

186.    Under Ohio Rev. Code § 2307.60(A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code."

187.    As a direct and proximate result of Norfolk Southern's unlawful actions in derailing the Freight Train and causing the Toxic Discharges, Plaintiffs and the Class members suffered and continue to suffer harm, injury, and losses, including physical injury to property, loss of use and enjoyment of their property, and diminution in property values, lost wages, loss of business income, loss of business goodwill.

188.    Norfolk Southern's conduct shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' and the Class members rights so as to warrant imposing punitive damages.

### Claim 10: Injunctive and Equitable Relief

189.    All allegations and paragraphs in this complaint are incorporated by reference.

190.    An actual, justiciable controversy exists between Plaintiff and the Class members and Norfolk Southern. A judgment from this Court regarding these issues would afford relief from uncertainty and insecurity with respects to rights, status, and other legal relations of the parties.

191.    Norfolk Southern had and has a duty to use reasonable care not to enter, invade, or intrude on Plaintiffs' or Class members' real property. Norfolk Southern also

2751491.4

owed a duty to Plaintiffs and members of the Class to exercise reasonable care in transporting hazardous chemicals and toxic pollutants.

192.    Norfolk Southern breached these duties by negligently, wantonly, carelessly, and/or recklessly failing to maintain and operate its Freight Train and failing to promptly contain the hazardous spill. These breaches caused Norfolk Southern's Toxic Discharges, which led to physical injuries to Plaintiffs' and Class members' properties.

193.    Plaintiffs and Class members have an adverse legal interest to Norfolk Southern. This adverse interest and the controversy that exists between the parties can be resolved through the specific relief sought.

194.    Wherefore, Plaintiffs, on behalf of themselves and the Class members, requests that the Court issue an Order requiring Norfolk Southern to establish and implement comprehensive testing and cleanup protocols for residential, commercial, and agricultural properties within a thirty-mile radius of the derailment site contaminated by Norfolk Southern's Toxic Discharges. Plaintiffs request that testing and cleanup protocols be sufficient to detect and remediate elevated levels of vinyl chloride, butyl acrylate, ethylhexyl acrylate, isobutylene, ethylene glycol monobutyl ether, diethylene glycol, carbon monoxide, hydrogen sulfide, hydrogen cyanide, and benzene on Plaintiffs' and Class members' properties, and in the soils and waters surrounding Plaintiffs' and Class members' properties.

## **Claim 11: Medical Monitoring**

195.    All allegations and paragraphs in this complaint are incorporated by reference.

196.     As described above, Plaintiffs and the Class members have been exposed to substantial quantities of toxic chemicals and hazardous substances—including known carcinogens—as a result of the trainwreck and its aftermath.

197.     As a direct and proximate result of this exposure to the Toxic Discharges, Plaintiffs and Class members have a significantly increased risk of developing cancer and other latent diseases, making periodic diagnostic medical testing reasonably necessary.

198.     Early diagnosis of cancer and other diseases provide significant value for Class members because it will help monitor and minimize the harm caused by Norfolk Southern's misconduct and provide Class members the ability to monitor diseases caused by Northern Southern's misconduct.

199.     Monitoring procedures exist that make early detection of cancers and other latent disease possible and beneficial. These monitoring procedures are different from the tests and procedures that are normally recommended in the absence of toxic exposures and are reasonably necessary due to the Class members' exposures to the toxic substances released by the train.

200.     Medical monitoring to facilitate early detection of these diseases is necessary to protect the health and well-being of Plaintiffs and Class members. Periodic physical examinations and diagnostic testing will reduce the risk of severe illness and allow early medical intervention to address detected problems early in the disease process, improving the chances for survival and the long-term well-being of those affected.

201.     The exposure to toxic chemicals, in particular vinyl chloride, requires the establishment of a comprehensive medical-monitoring program to ensure that the harms occasioned by Norfolk Southern's misconduct are mitigated to the extent possible.

202. Plaintiffs assert no claims for physical manifestation of bodily injury arising from the trainwreck and its aftermath and have no adequate remedy at law. Declaratory, injunctive, or other equitable relief is thus appropriate.

203. Plaintiffs request injunctive relief in the form of a Court-supervised medical-monitoring program funded by Norfolk Southern. The specifics of the medical-monitoring program is a subject for the Court to determine, following a hearing. The program should, at a minimum, require:

     a. Norfolk Southern to notify those who have been exposed to vinyl chloride and other toxic substances of the fact of their exposure and the need for periodic testing and examination;

     b. Comprehensive detection and treatment options for injuries caused by exposure to the toxic substances Norfolk Southern caused to be released into the air, water, and soil in the area around the derailment site;

     c. Monitoring of all Class members by designated treating physicians;

     d. Provision by Norfolk Southern to those designated treating physicians of information related to the diagnosis and treatment of the injuries that exposure to vinyl chloride and other toxic substances may cause;

     e. Collection of medical data for group studies in addition to the monitoring and treatment of individuals; and

     f. Norfolk Southern to address issues implicated by program administration as they develop.

204. The cost of the monitoring fund can be reserved for the exclusive purpose of mitigating the ill health effects Norfolk Southern has caused through its acts and omissions, thus ensuring the equitable use of such monies. This is an appropriate use of

the Court's injunctive powers and can be managed by a Court-appointed special master or trustee.

205.    Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants as follows:

A.    For an order certifying the Classes and appointing Plaintiffs as representatives of the Classes and appointing the lawyers and law firms representing Plaintiffs as counsel for the Classes;

B.    For all recoverable compensatory, statutory, and other damages, including remediation costs, sustained by Plaintiffs and the Classes, including all relief allowed under applicable laws;

C.    For payment of attorneys' fees and expenses as may be allowable under applicable law;

D.    For both pre-judgment and post-judgment interest on any amounts awarded;

E.    For punitive damages, according to proof;

F.    For injunctive and declaratory relief, as allowed by law; and

G.    Such other and further relief as this Court may deem just and proper**.**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 20, 2023        Respectfully submitted,

*s/ Ashlie Case Sletvold*
Ashlie Case Sletvold (0079477)
**PEIFFER WOLF CARR KANE
  CONWAY & WISE, LLP**
6370 SOM Center Road, Suite 108
Cleveland, OH 44139
216-589-9280
asletvold@peifferwolf.com
Kevin P. Conway*
**PEIFFER WOLF CARR KANE
  CONWAY & WISE, LLP**
1519 Robert C. Blakes Sr. Drive
New Orleans, Louisiana 70130
(504) 523-2434
kconway@peifferwolf.com

David P. Meyer (0065205)
Matthew R. Wilson (0072925)
Meyer Wilson Co., LPA
305 W. Nationwide Blvd
Columbus, Ohio 43215
614-224-6000
dmeyer@meyerwilson.com
mwilson@meyerwilson.com

Robert J. Nelson*
Lexi J. Hazam*
Patrick I. Andrews*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
415.956.1000
rnelson@lchb.com
lhazam@lchb.com
pandrews@lchb.com

2751491.4

Jonathan D. Selbin*
Wilson M. Dunlavey*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
212.355.9500
jselbin@lchb.com
wdunlavey@lchb.com

*Counsel for Plaintiffs and the Proposed Classes*

*\* Applications to appear pro hac vice to be filed*